1     IN THE UNITED STATES DISTRICT COURT

2        DISTRICT OF UTAH

3        CENTRAL DIVISION

4

5 UNITED STATES OF AMERICA,  )

6     Plaintiff,   )

7 vs.        )  CASE NO. 2:11-CR-812DB

8 APRIL J. RAMPTON,    )

9     Defendant.   )

10 _____)

11

12

13    BEFORE THE HONORABLE DEE BENSON

14    -------------------------------

15      August 8, 2013

16

17     Imposition of Sentence

18

19

20

21

22

23

24

25

```
1                      A P P E A R A N C E S

2


3
    For Plaintiff:              MICHAEL J. ROMANO
4                               STUART A. WEXLER
                                601 D Street, N.W.
5                               Washington, D.C.

6


7


8


9


10
    For Defendant:              ROBERT L. STEELE
11                              KRISTEN R. ANGELOS
                                46 West Broadway
12                              Suite 110
                                Salt Lake City, Utah
13


14


15


16


17


18


19


20


21


22  Court Reporter:             Ed Young
                                247 U.S. Courthouse
23                              350 South Main Street
                                Salt Lake City, Utah 84101-2180
24                              801-328-3202

25
```

```
 1   August 8, 2013                              2:30 p.m.

 2                   P R O C E E D I N G S

 3

 4        THE COURT:  Good afternoon.

 5        United States versus April J. Rampton, 11-CR-812.

 6   We're here for sentencing in this case.  Mr. Robert Steele

 7   and Ms. Kristen Angelos are here representing the defendant.

 8   Ms. Rampton is present.  For the United States, Mr. Michael

 9   Romano and Mr. Stuart Wexler are here.

10        Tell me who you have at counsel table.  I should

11   remember.

12        MR. ROMANO:  This is Special Agent Cameron

13   Maxfield, Your Honor.

14        THE COURT:  Nice to have you here, sir.

15        I have received sentencing memoranda from each

16   side and I have read them.  I have read the letters that

17   have been submitted.  There were various letters submitted

18   by friends and family members of Ms. Rampton.  I, of course,

19   read the psychological reports submitted also in connection

20   with the case.

21        The presentence report has been objected to and

22   maybe we should take care of that first.  It is my

23   inclination to find that the report has been appropriately

24   done and that the appropriate guideline section has been

25   referred to.  In any event, it does not appear to me that it
```

```
 1    is going to make any difference with regard to the offense

 2    level.

 3              Having said that, Ms. Angelos, are you going to

 4    argue this?

 5              MS. ANGELOS:  Yes.

 6              THE COURT:  I would like to hear your argument.

 7              MS. ANGELOS:  Your Honor, let me just make sure.

 8    Did you also receive a response to the government's

 9    sentencing memorandum?

10              THE COURT:  Yes.

11              MS. ANGELOS:  With regard to a couple of things

12    listed, I think the most important things would probably be

13    dealing with the loss, again, that section of the guidelines

14    and also with regard to intended loss.  Your Honor, as I

15    suggested in my original sentencing memo, we believe that

16    2B1.1 is the appropriate guideline.  Now, I would

17    acknowledge that under 26 U.S.C. 7206, one or two, which the

18    government could have filed charges with Ms. Rampton, it

19    does go to 2-T.  However, when you're looking at the

20    guidelines under 18 U.S.C. Section 287, they specifically

21    direct you to 2B1.1.  My guess is that the government is

22    asking specifically for 2-T for two reasons.

23              Well, one reason why I would imagine that they

24    filed it under 18 U.S.C. 287 is because there was a higher

25    maximum sentence pursuant to that instead of 26 U.S.C. 7206,
```

1    but I think more importantly if it is not directed to 2B1.1,

2    my guess is that the government is arguing that application

3    note 19-C should not be applicable as far as overstating the

4    seriousness of the intended loss.

5              We would again, argue, Your Honor, that pursuant

6    to the guideline manual and Tenth Circuit case law, when

7    there is only one guideline suggested under that statute,

8    that the Court must pursue the loss amounts under the

9    specific guideline.  We would suggest that is 2B1.1.  That

10   is outlined pretty heavily in our sentencing memo.

11             With regard to intended loss, Your Honor, I

12   understand that the government is asking for an intended

13   loss of $4.7 million.  I would acknowledge, Your Honor, that

14   there is Tenth Circuit case law suggesting when the actual

15   number for the loss amount is lower than the intended loss,

16   that the intended loss must prevail, but I believe the Court

17   has to make some findings as far as whether or not the

18   intended loss would be probable and other indicators such as

19   that.

20             As noted in my sentencing memo, with regard to

21   intended loss, specifically with regard to Mark Nelson's

22   1.6 million, I would suggest, Your Honor, that that was not

23   probable.  Noting that the government has indicated that

24   there was a $5 million payout that was paid out in May of

25   2009, Mark Nelson's 1045 filing went directly to frivolous

1   filing, as did a number of the 1040Xs, so I would suggest,

2   Your Honor, that that is something that the Court could rely

3   on as far as it not being probable in that it went directly

4   to frivolous filing.

5            THE COURT:  Could you slow down just a little?

6            MS. ANGELOS:  Sorry.

7            THE COURT:  Thank you.

8            MS. ANGELOS:  Your Honor, also with regard to

9   intended loss, we would argue that Shawna Smith's filings

10  have nothing to do with Ms. Rampton.  She filed her own

11  filings.  Ms. Smith's filings are not part of the scheme and

12  should not be included in the intended loss.

13           Now, as far as acquitted conduct or hung jury

14  conduct, conduct that is not part of the guilty counts, Your

15  Honor, we would ask the Court to take into consideration the

16  reasonableness aspect of the intended loss, and suggest that

17  there is a movement with Booker and the new Supreme Court

18  case of Alleyne, that if there is going to be an increased

19  punishment, the jury should be making the determination on

20  these issues.

21           Now, I would acknowledge that Alleyne only deals

22  with mandatory minimums, but I would again suggest that

23  there does appear to be movement there.  This is a perfect

24  case or a perfect example where we have hung counts where

25  they are asking for intended loss, and they are asking for

1    intended loss by individuals that did not testify at trial,

2    but were initially on the witness list and they decided not

3    to call, and they are asking for intended loss that they

4    have a witness testify to but did not include in any

5    indictment count, and they are also asking for intended loss

6    for Shawna Smith who had a 20-minute lunch conversation with

7    Ms. Rampton and did her own filings.

8           Maybe the question here is if we can, should we be

9    doing it?  As mentioned in my sentencing memorandum, in the

10   new Corsey case, Judge Underhill out of the Second Circuit

11   said is this reasonable, and that we should take a hard look

12   at this intended loss amount to determine whether or not

13   these are reasonable.  The facts here are that there is a

14   $4.7 million intended loss that the government is asking for

15   when there is only an $860,000 actual loss.

16          The other thing, Your Honor, as far as

17   reasonableness, is I would also ask the Court to consider

18   that Ms. Rampton did not determine the amounts.  It was

19   based on loan documentation that other individuals had

20   brought to her, and that she did not benefit from any of

21   this actual loss or intended loss except for the $227,000

22   check that she received.

23          If the Court does not have any questions, I will

24   move on to the obstruction of justice issue.

25          THE COURT:  Okay.

1              MS. ANGELOS:  Your Honor, as far as the

2    obstruction of justice issue, there are three things that

3    the government is asking for the Court to give obstruction

4    of justice on, and they are Shawna Smith's testimony, the

5    testimony of Michael Lavery and the testimony of Casey Hill.

6    First off, I would acknowledge, Your Honor, that under Tenth

7    Circuit case law Ms. Rampton simply testifying cannot be

8    considered obstruction of justice, that there actually must

9    be some perjurious testimony, and that the Court must make a

10   finding on that and that that testimony must be material.

11              With that in mind, Your Honor, we would argue, as

12   we did in our responsive sentencing memo, that the request

13   for perjury with regard to Shawna Smith we would suggest,

14   Your Honor, that it is just a perception or the difference

15   in a conversation that those two individuals were having.

16   Ms. Rampton acknowledged that Shawna Smith contacted her.

17   That would have been a material fact if she would have

18   acknowledged that she had not.  She acknowledged that Shawna

19   Smith told her an I.R.S. agent told her something was wrong

20   with the 1099 filings, but just because her perception was

21   different from Shawna regarding this conversation does not

22   make Ms. Rampton's testimony perjury.

23              As stated in our response brief, Ms. Rampton did

24   not do Shawna Smith's taxes.  Shawna Smith did.  It is not

25   inconceivable that Ms. Rampton could have perceived that Ms.

1  Smith did her tax filings incorrectly, especially

2  considering the conflicting information.  People were still

3  getting their tax returns even after this conversation.

4        The second thing they are asking you for that

5  indicates that Ms. Rampton perjured herself is with regard

6  to Michael Lavery, that Michael Lavery testified that Ms.

7  Rampton fudged the numbers or created the numbers out of the

8  air.  I would suggest, Your Honor, with regards to Mr.

9  Lavery that he is not credible at all.  I would suggest, and

10  as we have shown in the exhibits, that in 2008 when Ms.

11  Rampton did his tax filings she indicated an amount of

12  227,000.  If you look at his tax filings in 2007 he had a

13  tax filing of 204,000, so there is a difference of about

14  23,000 from 2007 and 2008, suggesting that those tax years

15  closely align with those certain numbers.  We would suggest

16  that it is ridiculous to suggest that Ms. Rampton pulled

17  that out of thin air considering how closely aligned they

18  are.

19        More importantly, I would suggest that once

20  Mr. Lavery debriefed with the government in 2012, he went

21  back and redid his taxes or filed an 1120-S associated with

22  2008, and when he did that, he acknowledged showing gross

23  receipts of over $447,000, almost $240,000 more than he had

24  indicated to Ms. Rampton.  We would suggest that in 2012

25  that Michael Lavery was actually truthful with regard to his

1    amounts in 2008, and that he was just giving numbers to Ms.

2    Rampton and Mr. Swapp the year before.

3            In fact, I would suggest that one of the things

4    they mention is that Mr. Lavery indicated that Ms. Rampton

5    was trying to inflate his income.  That can't be true if his

6    income was over $447,000 in 2008.

7            I would also suggest, Your Honor, that when

8    Michael Lavery was testifying, he indicated that the reason

9    he did the 1099-OID program was that in 2008 the bottom

10   basically fell out of his business and he needed the money.

11   This is clearly not true if he is filing now a 2008 1120-S

12   stating that he had over $447,000 in income when the year

13   before he only had 204.  It is suggesting that he is

14   actually making more money, over 200,000 in 2008 versus

15   2007, and we would suggest the more reasonable explanation

16   is that Mr. Lavery is giving the numbers he wanted to

17   Mr. Swapp and Ms. Rampton in 2008, and that he was the one

18   that was lying about his income to both parties.

19           I think one of the main points I want to make sure

20   that the Court understands is that Michael Lavery was the

21   only individual at trial that suggested Ms. Rampton altered

22   numbers.  Everyone else suggested that she used the loan

23   documentation numbers that they provided and that the

24   numbers were correct.  This is true of witnesses Clint

25   Nelson and Mark Nelson, and those were individuals whose

1    taxes Ms. Rampton had trouble filing with TurboTax also, and

2    that was the reason that Michael Lavery suggested that she

3    said to fudge the numbers.

4          You should also consider, Your Honor, with regard

5    to Michael Lavery's testimony is that he has pled guilty to

6    a money laundering charge, and he is providing testimony in

7    the hopes of securing a favorable substantial assistance

8    benefit and he has that benefit in helping the government

9    out.  I think that is all on Mr. Lavery.

10         With regards to Casey Hill, we would also suggest,

11   Your Honor, and if I understand the government's argument,

12   Mr. Casey Hill testified that Ms. Rampton told him that

13   during that second interview that she did not prepare

14   people's taxes, and that the perjury occurred when Ms.

15   Rampton indicated that she was truthful with Casey Hill

16   throughout her interview.

17         Your Honor, I would again argue that this is

18   simply a matter of perception.  I would suggest that there

19   was a difference in interviews between Nancy Phillips and

20   Casey Hill.  Ms. Rampton acknowledged in Nancy Phillips'

21   first interview that she did not tell her anything.  She

22   acknowledged that at trial.  In Casey Hill's interview that

23   was markedly different, and she acknowledged that she had

24   told them who she had talked to.  She talked about the

25   relationship that these individuals had with her.  She

1    talked about where she learned about the 1099s.  She talked

2    about how she understood the 1099s.  It was her perception

3    in taking these two interviews into account that she was

4    truthful with Casey Hill.

5          Again, remember that she didn't testify about this

6    interview until three years later after it occurred.  Casey

7    Hill took notes in the interview and Ms. Rampton did not.  I

8    would suggest, Your Honor, that perception and/or faulty

9    memory cannot lead to an obstruction charge based on

10   perjury.

11         The one other thing I would indicate that I

12   indicated in my memo, Your Honor, is that Casey Hill did

13   take notes during that interview, and there does not appear

14   to be anywhere in the notes a specific statement saying Ms.

15   Rampton told him that she did not do any of those

16   individuals' taxes.

17         Unless the Court has anything with regard to

18   obstruction I will move on.

19         THE COURT:  No, I don't.  Thank you.

20         MS. ANGELOS:  The last thing I would like the

21   Court to consider as far as sentencing are the 3553 factors.

22   I think this is a very important part of the sentencing.  As

23   already mentioned, Your Honor, I think the intended loss, if

24   the Court is going to consider the $4.7 million loss, or any

25   loss over the actual loss amount, it overstates the

1   seriousness of the offense and that has already been

2   discussed.

3          I would also suggest, Your Honor, though, with

4   regard to sentencing disparity, that the Court should

5   consider that we gave the Court a number of cases throughout

6   the nation where individuals similar to Ms. Rampton or

7   somewhat more egregious received sentences of six months,

8   one year, 12 months and one day, and I will just suggest a

9   couple of them.  There was an individual by the name of

10  Brown that we listed in our sentencing memo that actually

11  researched this, and she saw the fraud alerts and got one

12  year.  There was an individual by the name of Oiler that had

13  a $12.4 million loss and received a sentence of six months.

14  There was an individual by the name of Wilson, and it may

15  have been Wilson or a co-defendant, but she actually got a

16  $26,000 check from a client, so she was getting proceeds

17  from the 1099s in significant amounts, and she had red flags

18  all over the place, including a seminar where they told her

19  not to do it at her house but to rent an office, and she got

20  12 months and a day.  There was an individual by the name of

21  Chung received an 18-month sentence for a $760 million loss

22  conspiracy, and in that case she got a $70,000 check from

23  her brother.

24          In this case I would suggest that there is a

25  distinction from some of these individuals that even got six

1    months, a year, 12 months and one day, in that there were no

2    flyers, there was no solicitation, although there was a

3    check that the government keeps suggesting that Ms. Rampton

4    somehow was soliciting with that check, and I would suggest,

5    as we did in the trial, that the check was in excitement

6    that she had gotten a check from the I.R.S., not that she

7    was soliciting the scheme.  If she would have been

8    soliciting this, Your Honor, I would anticipate that there

9    would be several more individuals beyond just family members

10   and friends and those three people that actually solicited

11   her.

12        She didn't get any benefit, like the $70,000 that

13   I mentioned or the $26,000 check above and beyond the $500

14   here and there as far as donations.  I believe there was one

15   check from Stuart Nelson, which was a 5,000 or $8,000 check,

16   but it was not something that Ms. Rampton had asked for.  I

17   think Mr. Nelson just gave it to her because he was so

18   happy.

19        The only other red flag I would suggest that came

20   out at trial was this Shawna Smith conversation.  My guess

21   is that the jury may have determined guilty under the

22   willful blindness jury instruction, and I would still

23   suggest, though, that that was the only conversation that

24   occurred and it could have been construed as ambiguous with

25   Ms. Rampton that Shawna Smith did her own filings.

1          I think, Your Honor, with regard to the 3553

2     factors we also need to take into account the Winston Shrout

3     factor.  I think I laid that out pretty clearly in my

4     sentencing memo.  This is an individual that was raised by

5     an individual that I think is well known, at least through

6     government avenues, that Mr. Shrout is a freedom fighter or

7     sovereign citizen or belongs to that type of movement.  He

8     also comes from some type of polygamist background.  He was

9     Ms. Rampton's father.  She grew up with him at a pretty

10    young age, and it was somebody that she trusted and loved.

11    This is somebody that she confided in and believed in when

12    he told her that this program was correct.  As noted in Dr.

13    Golding's evaluation of her, this should be taken into

14    account in regards to sentencing and that it was a factor in

15    her decision to do this tax program.

16         The other thing I would suggest, Your Honor, is

17    the difficult life that Ms. Rampton has led.  Again, I won't

18    go into detail because her family is here, but with regards

19    to the memo, there is the suggestion that she did suffer

20    some abuse.  She has mostly been a single mother most of her

21    life, having had three marriages, two of them ending, and

22    one of them where she woke up next to her husband and he was

23    dead next to her.

24         She had a child that was a year old at that time.

25    She also has some significant physical disabilities, as we

1  relayed through our sentencing memo, and some mental health

2  issues that put a significant strain on her life,

3  specifically at this time, Your Honor.  Again, as Dr.

4  Golding suggests, this has to be a considered factor in

5  3553.

6         The last thing I would ask the Court to consider,

7  and I guess I would call it the Orion factor, is that she

8  has got a young son.  He has had a sheltered life, more so

9  than many children in mainstream America.  The Court should

10 consider that if you are imprisoning Ms. Rampton, it will

11 significantly affect him as an eight year old who has been

12 pretty sheltered his whole life.  He has been homeschooled.

13 Right now he lives out in the middle of nowhere, since they

14 lost their house, which was basically the cause of this

15 1099-OID program.  It is out in the middle of the hills,

16 Your Honor.  It takes significant time to get there.  I

17 would suggest that there is going to be some significant

18 trauma to this little individual if Ms. Rampton is

19 incarcerated.

20        I would also suggest, Your Honor, a financial

21 aspect also.  I anticipate that Ms. Rampton is going to have

22 Sophie, her 20 year old daughter, take care of Orion if she

23 is incarcerated.  If Ms. Rampton is incarcerated she is not

24 going to have the benefit of disability checks.  They will

25 stop while she is incarcerated.  I anticipate that Sophie is

1    going to have to raise Orion on an even less amount of money

2    and they will be living in more extreme poverty.

3           The only other thing I would suggest, Your Honor,

4    as far as deterrence, and if that is one of the factors the

5    Court is considering, is, Your Honor, she paid her taxes

6    before this happened and did so every year.  There is

7    nothing to suggest that she is going to engage in this type

8    of activity again.  In fact, it has been five years since

9    2008 and 2009 and she has no other criminal offenses.  This

10   was spurred on by the potential loss of a house and a

11   solution to that loss.

12          Again, she lives in the woods in St. George in a

13   home with no electricity.  She comes out of the woods pretty

14   infrequently because it costs money to get out.  The Court

15   won't have to worry about Ms. Rampton doing anything but

16   conducting her life appropriately in the future.

17          The other thing I would suggest, Your Honor, is

18   that the Court consider the movement with regard to federal

19   spending and the federal budget cuts, and do we really need

20   to lock up someone who is a first time offender and who is

21   nonviolent when there is a movement towards alternative

22   sentences?

23          Unless the Court has any other questions, I will

24   submit it.

25          THE COURT:  I don't right now.  Thank you, Ms.

1    Angelos.

2            Mr. Romano?

3            MR. ROMANO:  Yes, Your Honor.

4            Just as a housekeeping matter before I proceed

5    with my argument, I believe counts one through six are still

6    pending and we would move to dismiss those.

7            THE COURT:  Which counts?

8            MR. ROMANO:  Counts one through six, the counts on

9    which the jury was hung.

10           THE COURT:  They are dismissed.

11           MR. ROMANO:  Okay.

12           THE COURT:  Whatever happened to Winston Shrout?

13   Has anybody prosecuted him?

14           MR. ROMANO:  He is not currently facing any

15   charges, Your Honor.  Beyond that I can't comment.

16           THE COURT:  Do we know where he is?

17           MR. ROMANO:  I can't comment on whether or not the

18   government is aware of his location.  Your Honor, if you're

19   interested and you think this is important, maybe we can

20   approach and take this up at sidebar.

21           THE COURT:  I just wondered.  His name keeps

22   coming up in these cases, and you have another one before

23   me, and Winston Shrout is always coming up.  He is like the

24   godfather of this whole thing and he ought to be prosecuted

25   if everyone else is.

1          MR. ROMANO:  I do not disagree with you there,

2    Your Honor.

3          THE COURT:  Go on.

4          MR. ROMANO:  I want to start by addressing a

5    couple of the arguments related to the sentencing guidelines

6    and then, as Ms. Angelos did, move to the 3553(a) factors.

7          To start with, I won't respond point by point to

8    every item in the defendant's most recent pleading, although

9    I would just say that generally we disagree with pretty

10   much --

11         THE COURT:  Everything.

12         MR. ROMANO:  -- everything.

13         Starting with the recent Supreme Court decision in

14   the Alleyne case, Your Honor, I think that the statement of

15   the law was correct about how it applies to mandatory

16   minimums, but the application to this case is completely

17   incorrect.  Alleyne has no bearing on the application of the

18   sentencing guidelines to a discretionary decision on what

19   sentence to impose.  It speaks about mandatory minimums.  It

20   only speaks about mandatory minimums.  It does not purport

21   to go any further than that.  There is no movement at the

22   Supreme Court to overrule Booker and find this application

23   of the sentencing guidelines, including loss amounts,

24   unconstitutional.

25         There is similarly also no requirement that an

1    intended loss be probable.  Probability used to be the

2    standard when this conduct would have been measured under

3    the old Section 2-F of the sentencing guidelines.  2-F has

4    been repealed and intended loss specifically does not

5    include merely probable amounts under 2-B nor under 2-T.

6    That is not something that the Court shoulder consider.

7            Furthermore, both Tenth Circuit and Supreme Court

8    case law supports the inclusion of uncharged and even

9    acquitted conduct, including the tax returns that were

10   uncharged in this case, and the counts to which the jury was

11   unable to return a verdict.

12           The Court is well within its rights to consider

13   that part of the conduct as part of the intended loss in

14   this case.  The loss computation is clear and

15   straightforward.  It is based on the claims that she

16   submitted and the tax returns that she submitted, and the

17   amount of money that she and others sought to gain from this

18   scheme.

19           Unless the Court has any questions on that point I

20   want to talk about --

21           THE COURT:  No, I don't.

22           MR. ROMANO:  -- the issue of obstruction.

23           As to the testimony related to the Shawna Smith

24   conversation and the interview with Agent Hill, the issues

25   are pretty similar.  The defense paints this as a mere

1  difference in memory, but it is not that.  The defendant did

2  not testify about her failure to remember, she didn't

3  suggest that she was not sure what she said or she was not

4  sure what Ms. Smith said or that she was not sure what Agent

5  Hill said.  She testified very clearly and directly about

6  those conversations.

7          Regarding Ms. Smith, she did not speak on direct

8  examination to the issue of whether Ms. Smith told her that

9  the I.R.S. had warned Ms. Smith that the return was

10  frivolous.  She didn't speak to whether Ms. Smith advised

11  her of the possible consequences.  On cross-examination I

12  asked her if that was part of the conversation, and she

13  clearly denied hearing that this tax return and this scheme

14  or method was frivolous.  She denied hearing that she might

15  face fines if she persisted with those returns.  There was

16  not any hesitancy and there wasn't any testimony about not

17  being able to remember or being uncertain or that it was a

18  long time ago.  That was what she said and that is

19  completely inconsistent with what Ms. Smith testified to.

20          Similarly, she said that she was truthful with the

21  agents, and that was in direct response to Agent Hill's

22  testimony that she lied about preparing tax returns for

23  others, and that was largely what Agent Hill said that she

24  lied about.  So when Ms. Rampton said that I was truthful

25  with Agent Hill and Agent Johnson from the beginning to end,

1    that is the only thing that she could have been talking

2    about.  She was responding to an allegation that she lied.

3    Then on cross-examination she was asked about that, and she

4    denied telling Agent Hill that she did not prepare returns

5    for others.

6           Now, it is true that that part of the conversation

7    does not appear in Agent's Hill notes.  I will proffer that

8    we checked and it also doesn't appear in Agent Johnson's

9    notes, but it appears in the Memorandum of Interview which

10   was prepared three days later.  The notes are not designed

11   to be a transcription of the interview.  They are a memory

12   aid to aid the agents as they prepare the memorandum.

13          Now, as to Mr. Lavery, I think the Court will

14   recall his testimony and assess his credibility as far as

15   his demeanor and what he said, but as far as the numbers go

16   on his tax returns, there is a little bit of an apples and

17   oranges comparison that the defendant is making.  When Ms.

18   Rampton prepared Michael Lavery's 2008 form 1040, his

19   personal tax return, she listed that he had approximately

20   $227,000 of business income, not gross receipts, but income.

21   When Michael Lavery had the most recent tax return prepared,

22   he said that he had about $440,000 of gross receipts.  That

23   is not the total income of his business.  That is the total

24   his business took in before paying out the expenses.  His

25   actual business income that he reported on this return was

1    substantially less than what showed up on the return

2    prepared by Ms. Rampton.  It was about $100,000.

3              Similarly, the 2007 business tax return that

4    counsel alluded to, the amount that counsel said was similar

5    to Mr. Lavery's business income that April Rampton prepared

6    was his gross receipts.  The point of all that, as we raised

7    it, is that Ms. Rampton testified that Michael Lavery

8    brought me his receipts but he didn't have his expenses yet.

9    If that were true, what she wrote on that tax return should

10   have resembled the gross receipts figure from 2008.  It

11   should have been closer to that $400,000.

12             Although Mr. Lavery may have been the only person

13   to talk about fudging numbers on the returns as far as just

14   making numbers up, he was not the only person to talk about

15   the defendant's attempts to circumvent the fraud protection

16   aspect of TurboTax.

17             If the Court has no more specific questions about

18   that, I can move on to the 3553(a) factors.

19             THE COURT:  All right.

20             MR. ROMANO:  Your Honor, it is the government's

21   position that a sentence at the low end of the guideline

22   range here, a sentence of 63 months is sufficient but no

23   greater than necessary to satisfy the factors set forth in

24   3553(a).  I want to start first with the need for the

25   punishment to reflect the seriousness of the offense,

1    provide just punishment and promote respect for the law.

2          This is not and never has been a tax program,

3    despite the fact that counsel continually refers to it as a

4    tax program.  It is a serious fraud.  The defendant sought

5    to cause and did cause harm.  She sought to cause about $4.5

6    million of harm and did cause about $800,000 of harm.  It

7    was not harm to a person.  There is no series of victims

8    here as there is in a Ponzi scheme case or something like

9    that, but it is a harm to society and it is a harm to the

10   government, and the crime is no less serious for the fact

11   that it does not involve human victims.

12         There seems to be some thought in this case that

13   the crime is less serious because it occurred on a tax form

14   and taxes are somewhat confusing.  The defense takes issue

15   with our contention that this scheme is ridiculous on its

16   face.  We would submit that that is an entirely appropriate

17   way to think of it.  It is ridiculous in part because the

18   returns are false.  They involve false income and false

19   withholding that the defendant knew she never had and that

20   she knew her clients never had.

21         Someone as experienced with taxes as the defendant

22   is knew that those numbers were not true, regardless of any

23   of this nonsense about the banking system and how she was

24   owed something.  The whole idea about there being some

25   mystery and corruption in the banking system and that the

1   I.R.S. could help you out with it is also ridiculous.

2   Witness after witness took the stand and told the jury and

3   the Court that their initial reaction to this was that it

4   was too good to be true and that it sounded like they were

5   getting something for nothing.  That reflects a commonsense

6   approach, a commonsense way of thinking that recognizes that

7   neither the government nor banks nor any entity is just

8   going to repay you the entire amount of all of the debt that

9   you have in exchange for nothing.

10          Now, they may have changed their minds when they

11  saw the check, and they may have decided to go forward and

12  maybe they believed in it or say they did, and maybe they

13  realized that it might work and so that is why they decided

14  to do it, but it is ridiculous both with the numbers on the

15  returns and the justification for the scheme.  It is a

16  transparent fraud.

17          Yes, the I.R.S. should not have paid out a check

18  to Ms. Rampton.  The I.R.S. should not have paid out a check

19  to any of the other people who received refunds, but that

20  check is not an endorsement.  That check is based on false

21  numbers on a tax return.  It takes advantage of a systematic

22  weakness in which the I.R.S. processes returns by the

23  semitruck load and try to get out refunds under a

24  Congressional mandate.  It is a serious offense and the

25  sentence needs to reflect that.

1      The sentence also needs to promote deterrence.

2 Now, in part that is based on --

3      THE COURT:  While I am thinking about it, could

4 you go back to one thing you said?

5      MR. ROMANO:  Yes.

6      THE COURT:  Where did you get the 800,000 figure

7 from?  I am trying to find it in your brief.

8      MR. ROMANO:  That was the approximate amount of

9 the loss that succeeded, Your Honor.  I believe it is in our

10 Exhibit A in the brief.  There is a table that detailed the

11 total tax loss, and at the far right of that table there

12 were columns that indicated the amount of refunds that were

13 issued and the total actual tax loss.

14      THE COURT:  Okay.  I have that in front of me.

15      MR. ROMANO:   Okay.

16      THE COURT:  That is the 807,000?

17      MR. ROMANO:   Right.

18      It is a little bit higher than the amount of

19 refunds that were issued, because some of the people owed

20 taxes and they were getting refunds and also not paying

21 taxes that they owed.

22      THE COURT:  Thank you.

23      MR. ROMANO:  I will turn now to the topic of

24 deterrence.  The sentencing commission has stated in

25 promulgating the tax guidelines, which in this case are

1    identical to the fraud guidelines, that tax crimes are

2    serious offenses and that before the guidelines there was a

3    frequency of people convicted of tax offenses receiving

4    either probationary sentences or short jail term sentences,

5    and that the guidelines were created in the tax area to

6    reflect a judgment that that needed to change, that

7    sentences needed to be made more serious to promote an

8    increased amount of deterrence for tax fraud.  And, further,

9    because there are so few tax fraud prosecutions brought

10   nationwide annually, relative to other types of crimes that

11   are prosecuted, that the deterrent value in these cases is

12   especially high.

13          The defense mentioned that Ms. Rampton has paid

14   her taxes before engaging in this scheme, and that is an

15   argument for specific deterrence and will go to recidivism,

16   but that does not address the argument about general

17   deterrence.  In particular, one of the witnesses, and I

18   believe it was Mark Nelson, testified that when he decided

19   to do this, he thought what is the worst that is going to

20   happen?  I might have to pay back the money.  Well, that is

21   a message, and if people hear that message, if people hear

22   what is the worst that is going to happen is I have to pay

23   back this money, then there is no real disincentive for

24   engaging in a fraud like this.  There needs to be a

25   consequence to discourage them, and that consequence needs

1    to be prison.

2          The next factor that we would address is the need

3    to avoid disparity in sentencing.  One way the Court can

4    seek to avoid disparities is by applying a sentence within

5    the guidelines, which represents a judgment about the

6    sentences that are appropriate in the broad majority of

7    cases.

8          Beyond the guidelines there is also the need to

9    treat similarly situated defendants similarly.  The Court

10   has seen briefing from the parties on other OID cases, some

11   from the defense and some from the prosecution, and the

12   defense says that they have cited cases where the conduct is

13   more serious than in this case.  That is frankly not so.  In

14   the cases that they have cited, and there is one case where

15   the people pled guilty and the people that pled guilty

16   received acceptance of responsibility and received an

17   extraordinary downward departure, and some of the other

18   cases involved conspiracies to defraud the government of

19   more money than was at issue here, but the people whose

20   sentences the defense is discussing are minor players in

21   that conspiracy.

22          So, yes, the guidelines might have a higher

23   offense level range, and the sentence might represent a

24   downward departure, but it also might represent a conclusion

25   by the Court that those people don't deserve to be sentenced

1   in the same way as the heads of the conspiracy.

2        This defendant did not plead guilty.  She promoted

3   the scheme to others.  Whether or not it was by flyers or

4   advertisements, she did promote the scheme to others.  She

5   did cause a larger loss, both real and intended, than

6   several of the instances that the defendant cites, and so

7   her sentence should be more serious than the cases cited by

8   the defendant.  Not quite so serious as some of the cases we

9   cited, such as the Breckie case, where he was the head of

10  the conspiracy involving Juanita Chung, but serious,

11  nonetheless.  There is nothing exceptional about the

12  defendant's case or her conduct that would justify a

13  sentence well below the range recommended in the guidelines.

14       Now, the next factor we want to address, and I

15  don't think it is called this in the statute, but it is the

16  likelihood of recidivism.  Now, in Ms. Rampton's favor she,

17  as far as we can tell, had paid taxes and had filed tax

18  returns for the years that she needed to leading up to this

19  conduct, and she does not have the kind of criminal history

20  that I'm sure the Court sees in other cases.

21       At the same time, she has not at this stage or at

22  any stage expressed any regret or recognition of the harm

23  that she has caused to the United States.  She may regret

24  going to trial.  She may regret putting her family through

25  this.  She may regret getting her friends involved.  The

1    tone of her testimony and of her pleadings is fairly

2    unapologetic about what she did.

3           Addressing the history and characteristics of the

4    defendant, here, again, there are aspects of this factor

5    that weigh both ways, for a lighter sentence and for a more

6    severe sentence.  The defendant's life that she has

7    experienced and her upbringing, and we have certainly seen

8    those arguments from the defense, and we would agree that

9    those are factors that might compel a court to mitigate when

10   sentencing, but we would suggest the way to do that is to

11   sentence at the low end of the guideline range.

12          There are also some factors in her history and

13   characteristics that suggest a higher sentence.  As the

14   Court could see during the testimony, Ms. Rampton is

15   intelligent, she had a good memory, and I recall one

16   instance in the testimony where a tax return was displayed

17   on the screen and before any lawyer could ask a question,

18   she said, oh, that is not one of mine.  She clearly knew

19   what she was looking at.  She was able to engage and answer

20   questions and had a very good memory of what she did several

21   years go.

22          She also has quite a bit of experience preparing

23   taxes.  She worked in the payroll department of a company at

24   one point.  During one exchange when she was talking about

25   accepting, quote, unquote, donations from her clients, and I

1   asked are you a charity, she said, well, I am not a 501C3,

2   citing the specific provision of the Internal Revenue Code

3   governing the taxing of charities.  She understood her

4   conduct.  Her upbringing and the struggles that she has

5   experienced do not explain her conduct, except that she

6   desperately needed money, a situation not uncommon with

7   people who find themselves in court.

8          Also, it makes little sense to think, as Dr.

9   Golding apparently does, that the defendant was

10  indoctrinated into any kind of tax protester or sovereign

11  citizen subculture.  No one denies that Winston Shrout is

12  part of the subculture today, but we have no evidence about

13  whether he was part of it in the 1970s when the defendant

14  was being brought up.  In the defendant's own testimony she

15  admitted that Mr. Shrout was distant, that he didn't

16  especially take to girls, and that he was frequently gone

17  and that she lived outside of the home from age 18 on.  As

18  an adult grown woman, and at the time she committed this

19  offense, she could have had the good sense to say no.

20  Shrout was not even the person that explained the bulk of

21  this to her.  It was this mysterious Tony.

22          Mr. Jessop had the good sense to say no, at least

23  initially, and he is married to another daughter of

24  Mr. Shrout.  The Court also heard testimony from Liz Shrout

25  that if she had known Ms. Rampton learned about this from

1    their father, she wouldn't have done it.  Other siblings and

2    other relatives of Shrout have enough good sense not to

3    listen to his advice.

4          So for all of those reasons, because of the

5    sentencing guidelines and because of the 3553(a) factors, we

6    submit that a sentence at the low end of the guideline range

7    of 63 months imprisonment is sufficient but not greater than

8    necessary to meet the goals set forth by 3553(a).

9          I can talk now or later about other conditions, if

10   you would like.

11         THE COURT:  Thank you, Mr. Romano.

12         Would you like to say anything in response to

13   Mr. Romano?

14         MS. ANGELOS:  Your Honor, just briefly.

15         I do want to suggest, Your Honor, as Mr. Romano I

16   guess has acknowledged, that with regard to Casey Hill and

17   the notes that he had written on that day, Mr. Romano also

18   said that the other agent had taken notes on that date and

19   that there was nothing in his notes specifically indicating

20   that Ms. Rampton had said that, but he said that a memo was

21   completed three days later suggesting that.  I would let the

22   Court know that it was not Casey Hill that did that memo.

23   It was an individual by the name of Scott Johnson who did

24   that memo.  It was not Casey Hill's memo.  The government

25   did not have Scott Johnson come in and testify at trial.

1          The only other thing I would mention, Your Honor,

2    and I usually will not do this, but with regard to the

3    victims in this case I think the Court should consider the

4    victim in this case is the I.R.S., in looking at a sentence

5    for Ms. Rampton and tempering it with some of the conduct

6    that was shown by the I.R.S.  When Mr. Romano talks about

7    Ms. Rampton being this intelligent woman and knowing all of

8    these things, I would suggest, Your Honor, that there were

9    individuals all over the country that were doing this type

10   of program after they had attended seminars, after they had

11   been in chat rooms listening to individuals saying that

12   people had gotten money back from the I.R.S. and that this

13   was a program that was a lawful program.

14          If you remember the testimony of Nancy Gillis, the

15   I.R.S. actually had to change how they went out and got

16   money back for a frivolous filing because there were so many

17   people that the I.R.S. gave money back to.  She indicated

18   that normally they would go out and interview and try and

19   get the individuals to give the money back, and they gave a

20   specific alert not to do those interviews and instead froze

21   the individuals' accounts before they went out because so

22   many individuals were getting this money.

23          What I would suggest, Your Honor, as we did, that

24   once that money went out, Your Honor, throughout the

25   country, and people are in chat rooms saying I got this

money back, it is not inconceivable that individuals would

have thought that this was a possibility with all of this

money going out.

As indicated in the brief, somebody got a $5

million check in May of 2009.  There was some conflicting

information out there, and I would suggest also that Ms.

Rampton is very intelligent, but there were very intelligent

individuals doing this.

With regard to Ernie Jessop, yes, at first he did

not do this program.  If you remember his testimony, once he

saw that check from Ms. Rampton, he indicated that

everything Tony had told them during that interview had come

to fruition.  That is why he indicated that he wanted to do

it.  It is not unreasonable to think that once these checks

came in that Ms. Rampton and others believed that this

process was correct.

I think the Court should temper any sentence with

regard to the I.R.S. and what they did.

THE COURT:  Thank you, Ms. Angelos.

Ms. Rampton, would you like to say anything in

your own behalf?

MS. RAMPTON:  Yes, Your Honor.

THE COURT:  I would be happy to hear anything you

want to say.

MS. RAMPTON:  Can I stand here?

 1          THE COURT:  Step over here to the microphone and

 2    you'll be heard better, please.

 3          MS. RAMPTON:  Your Honor, he says that I don't

 4    feel bad and that I have not taken any accountability for my

 5    actions.  If I would have known that this was not legal I

 6    swear I would have never done it.  I helped other people do

 7    it because that is how I am.  I have the knowledge.  I would

 8    always do everything I could to help benefit my family.

 9          If I could go back and change all of this I

10    promise I would do it.  In hindsight there is nothing I can

11    do about it now, but please don't take me away from my

12    children.  I have always done everything I could to be

13    accountable and responsible for the three children that I

14    brought into this world.  I was a single mother for most of

15    their lives.  I worked really, really hard to make sure that

16    they had a roof over their heads and that they never went

17    hungry.  If there was a victim that I could go to and beg

18    for their forgiveness, I would.  If I could make some sort

19    of amends -- you're the only one that I can turn to.  Please

20    make this right.  I don't want to sit here and cry.  I think

21    you know what I mean.  I will sit back down.

22          Thank you, Your Honor.

23          THE COURT:  Thank you, Ms. Rampton.

24          As to the guidelines issues that were raised,

25    under the circumstances I find the loss amount is better

1    based on the $871,000 figure, which represents the actual

2    refunds that were caused with Ms. Rampton's help.  That

3    gives us an offense level of 20 rather than 24.  I think

4    under the circumstances that I could use the higher 4.7

5    million amount, and I probably would in a different case, in

6    a more -- I don't know if there is such a thing as a more

7    typical criminal engaging in this kind of activity -- but I

8    don't find Ms. Rampton typical.  She was not making a lot of

9    money off of this.  Those of us who were here for the trial,

10   counsel and me, know all of the interesting details and

11   circumstances with respect to Ms. Rampton and how she got

12   involved in this.  Under all of those circumstances, I find

13   the loss amount is better reflected by the actual loss of

14   871,000, which gives us a level 20.

15           I am persuaded by the government and by a

16   preponderance of the evidence and by my own participation

17   and in listening to the testimony at trial that Ms. Rampton

18   did perjure herself at trial.  I think she did repeatedly.

19   I find the two points for obstruction to be appropriate,

20   giving us an offense level of 22, yielding a range of 41 to

21   51 months under the guidelines.

22           I'm inclined to sentence below the guideline range

23   level in this case, and will refer to the 3553 factors in

24   Title 18 for an explanation.  I am persuaded from the

25   letters that have been sent in and from observing Ms.

1   Rampton, and I have no reason to doubt that she is a very

2   caring and very loving person with a heart of gold, as has

3   been described by several of the people that have written in

4   about her, and she demonstrated that just now in her

5   statement to the Court and I don't have any doubt about

6   that.  I do think that Ms. Rampton would do anything for a

7   loved one or a friend and someone in need.  That is a great

8   virtue and a virtue to be proud of.

9           Unfortunately, I also find that Ms. Rampton, for

10  whatever reason, has the serious vices of being dishonest

11  and being remarkably disrespectful of the law.  I do.  Greed

12  comes into play also.  People are not always just endowed

13  with certain virtues, which they can always fall back on and

14  point out how loving and caring and generous they are, but

15  we still have a criminal legal system because you can't lie

16  and cheat.

17          Ms. Angelos talks about how people could have

18  thought this was a legal system.  I disagree.  This is not a

19  whole lot different than having somebody down the road tell

20  you that the backdoor to the bank is open.  Go in there and

21  get some money.  People are doing it.  Look, he just came

22  out with $100,000.  People would go in the back of the bank

23  and start grabbing money.  Well, the door was unlocked and

24  the money is in there and we can get it.

25          Having studied this as much as I have, there is

1    nothing about this program that could cause any person with

2    a modicum of intelligence and honesty to take this money

3    from the government that is based on what you owe on a

4    mortgage.  Any person who was raised to be even remotely

5    honest would know that that is dishonest.

6            I don't know everything that went into Ms.

7    Rampton's upbringing, but I doubt it went so far as to

8    believe that she could obtain 200 and some odd thousand

9    dollars from the government based on the amount of money

10   that she owes on a mortgage that she has not paid and

11   because of that her house is in foreclosure.  It is

12   ridiculous.  If all these people around the country are

13   pulling it off with the I.R.S., it is only because they are

14   all dishonest and they are all getting something they know

15   and they should know in their hearts they are not entitled

16   to.

17           Oh, this is some government program.  They are

18   giving away money.  In fact, the more I owe on my house the

19   more money I get back.  There needs to be punishment here.

20   It is easy after the fact to say, well, I would do anything

21   for anybody and I wish I had not done it, but it happened,

22   and I think the jury was quite responsible in this case.  It

23   was clear to me that they gave Ms. Rampton the benefit of

24   the doubt up until they were convinced that she was put on

25   specific notice by the I.R.S. that this is not legal.  This

1    is not honest.  This is not within the I.R.S. regulations

2    and laws.  From that point forward she was convicted.  On

3    the counts before that, including her own refund check, she

4    was given the benefit of the law and was acquitted.  I think

5    that was a fair way to assess this case.  I quite agree with

6    that.

7         This case is unique.  As to the 3553 factors,

8    first, the nature and circumstances of the offense, we know

9    what it is and I have just described that.  It is a

10   dishonest act.  It is raiding the treasury, and especially

11   from someone who claims to have had accounting classes at

12   Dixie College and knows a little bit about taxes.  Someone

13   having done taxes for others and herself and family members

14   for years, should have known better, even in regard to the

15   counts for which she was acquitted.

16        The history and characteristics of the defendant

17   make this case more difficult.  A lot of people have

18   difficult childhoods.  A lot of people have problems that

19   are thrown at them throughout their lives.  We all do to

20   some extent.  I think these are being exaggerated here, but

21   I can't discount that there are some fundamental problems

22   with the way Ms. Rampton had to grow up.  Moving 58 times

23   during her childhood is certainly not easy.

24        What kind of indoctrination she got, I don't know.

25   I have not lived in the communities she was raised in.  I

1    can only speculate, but I can't imagine it is as bad as her

2    counsel are now trying to say it was.  Her mother, and I

3    don't know if her mother is here, but I got a letter from

4    her and she seems to be a responsible woman, at least

5    responsible enough to write a good letter.  She must have

6    taught her the normal kinds of things that kids get taught,

7    but I do recognize that it was tough growing up.  I

8    recognize also the medical issues that Ms. Rampton has had

9    to deal with.

10           The statute says that I should fashion a sentence,

11   and I'm going to read from it, that the need for the

12   sentence imposed is to reflect the seriousness of the

13   offense and, as I have said, this is a serious dishonest

14   act.  Then there is a comma, to promote respect for the law,

15   and perhaps my biggest problem with Ms. Rampton is I don't

16   see any real respect for the law here or those who have

17   engaged in this same kind of tax fraud behavior.  I just

18   don't see the respect for the law.  This needs to be

19   punished for that reason alone.

20           Next is to afford adequate deterrence to criminal

21   conduct.  That is to deter others.  That is the main reason

22   I feel a sentence of incarceration is necessary here.  I

23   quite agree with Mr. Romano on that.  There needs to be some

24   recognition that not only can you not do this, but the worst

25   thing that happens is not that you won't get to keep the

1    money, you're going to face some consequences.

2          Next is to protect the public from further crimes

3    of the defendant.  That would be the specific deterrence to

4    deter Ms. Rampton.  I don't think we have much of that here,

5    if I am any judge of that, and that is what they call me,

6    but I don't know how good a judge I am of character in this

7    regard, but I would think Ms. Rampton is not a high risk for

8    doing this or anything like it again.

9          Next is the special needs of the defendant and

10   does she need special medical care or vocational training in

11   prison.  In that regard I focus more on her health issues,

12   which are serious, and on the situation at home with the

13   son, an eight year old son, and I think her daughter is 18.

14   That is a difficult situation.  It is by any measure.

15          Putting all of that together, I am sentencing you,

16   Ms. Rampton, to the custody of the Bureau of Prisons for a

17   period of 21 months followed by a period of supervised

18   release of 36 months.  That is a sentence roughly half of

19   the low end of the guideline range, which I found to be

20   applicable.  It is a third of the low end of the guideline

21   range that the government is insisting on.

22          Do you want more of an explanation for the reason

23   for my sentence, Mr. Romano?

24          MR. ROMANO:  No, Your Honor.

25          THE COURT:  Do you?

1          MS. ANGELOS:  No, Your Honor.

2          THE COURT:  As I say, every case is different, and

3    this one is certainly different.

4          One other thing, and maybe I said this earlier,

5    but I have seen a lot of fraud cases and been around the

6    facts of many more, and I think I did mention that Ms.

7    Rampton is not a typical fraud defendant in the sense that

8    she is out either putting on seminars or trying to induce

9    other people to do this for her own personal benefit

10   monetarily.  I see that as quite an important reason for

11   both a downward departure from the sentencing guidelines in

12   that way or for my reasons pursuant to 3553.

13         I think 21 months in prison is a long time.  We

14   talk about short sentences, but that is a long time to take

15   a mother away from her children, for the better part of two

16   years, and I don't think I need to apologize, but that is a

17   long time, and it is my sense that that will deter others

18   from getting involved every bit as much as if I was to give

19   Ms. Rampton 63 months in prison, which would only cost the

20   taxpayers another -- I don't know -- it is $40,000 or so a

21   year to house somebody.  Under all of the circumstance I

22   think that affords the deterrence we need in this important

23   area of prosecuting tax crimes.

24         You have 14 days to take an appeal of this

25   sentence, Ms. Rampton, if you feel that it has been

1       illegally done.

2               Do you want me to recommend someplace close to

3       Utah for family --

4               MS. ANGELOS:  Yes, Your Honor.

5               If you could recommend F.C.I. Phoenix, I think

6       they have a women's camp there.  That would also facilitate

7       family visitation.

8               THE COURT:  I will recommend F.C.I. Phoenix for

9       family visitation purposes.

10              I almost forgot.  There will be a special

11      assessment fee required to be paid by Ms. Rampton.  I have

12      forgotten how many counts --

13              MR. ROMANO:  I believe it was nine, Your Honor.

14              THE COURT:  $900.  That is $100 for each count.

15              I'm also ordering Ms. Rampton to pay restitution

16      in the amount of $230,678.36, which is the amount of the

17      refund that she personally received which she needs to pay

18      back.  I am not ordering the defendant to pay a fine.  I

19      find that she does not have the ability to pay a fine.

20              On supervised release there will be three special

21      conditions:  One, that the defendant shall refrain from

22      incurring new credit charges or opening additional lines of

23      credit unless she is in compliance with an established

24      payment schedule on her restitution.

25              Secondly, the defendant shall provide the U.S.

```
 1    Probation Office with complete access to all of her business

 2    and personal financial information.

 3              Thirdly, the defendant shall participate in a

 4    mental health treatment program under a co-payment plan as

 5    directed by the probation office and take any mental health

 6    medications or other treatments that are prescribed or

 7    required by the mental health professionals, and not possess

 8    or consume alcohol while she is under treatment.

 9              I think that is everything.

10              Have I forgotten anything from your point of view,

11    Mr. Romano?

12              MR. ROMANO:  We would ask for only one additional

13    condition of supervised release, Your Honor, and that is a

14    restriction of the preparation of tax returns for others.

15              THE COURT:  I will add that restriction.

16              Anything else from you, Ms. Angelos?

17              MS. ANGELOS:  Your Honor, the only thing I would

18    ask is --

19              THE COURT:  Self-surrender.

20              Do you object to self-surrender?

21              MR. ROMANO:  We do, Your Honor.

22              THE COURT:  Okay.

23              MR. ROMANO:  Primarily because of the location

24    where Ms. Rampton is living now.  We understand that Ms.

25    Rampton lives quite a distance from the nearest city.  I
```

1  think it is 15 miles on a highway west of St. George and

2  then another 20 miles down a county dirt road, and then a

3  couple of hundred yards off the road.  There is a valley

4  with only one entrance, and we believe the valley to be

5  owned by a land trust that is owned by a polygamist group.

6  While we don't have an indication that they would be violent

7  should Ms. Rampton fail to surrender, but given the nature

8  of the group that lives there and does not follow the laws

9  of the state, as well as they may be members of the

10  sovereign citizen community and may not agree with and

11  follow the laws of the United States and recognize the

12  authority of the courts, we think there is a potential for

13  violence should agents have to go there to take her into

14  custody.

15       MS. ANGELOS:  Your Honor, may I suggest that Ms.

16  Rampton has been on pretrial release for a significant

17  period of time, and that she has lived at that residence and

18  she has always made her court hearings.  She has been

19  assessable as far as me being able to contact her.  She is

20  aware that if she does not self-surrender that she will be

21  taken into custody.  I would suggest, Your Honor, and

22  acknowledging that she has been doing so well on pretrial

23  release and where she is living, that the Court consider

24  self-surrender at this point.

25       MR. ROMANO:  Your Honor, if we can just have a

1    brief response, she has appeared and she seems to have been

2    doing well on pretrial supervision, but there was no prison

3    sentence hanging over her head that time.

4         THE COURT:  Well, there was --

5         MR. ROMANO:  The circumstances have changed now.

6         THE COURT:  -- that possibility.

7         MR. ROMANO:  That is certainly true, Your Honor.

8         MS. ANGELOS:  Your Honor, may I suggest that Ms.

9    Rampton just indicated that pretrial services have been to

10   her house a number of times.

11        THE COURT:  Could I see counsel at sidebar with

12   Mr. Manross?  And someone from the marshal's office, will

13   you come up?

14        (Bench conference off the record.)

15        THE COURT:  I will allow self-surrender.  I'm not

16   satisfied that there is evidence to indicate that the

17   defendant will not remain compliant with the orders of the

18   Court.

19        Ms. Rampton, will you be able and capable of

20   transporting yourself to the facility that is designated?

21        MS. RAMPTON:  I will make sure I get there, Your

22   Honor.

23        THE COURT:  I have your assurance that you'll do

24   that lawfully and properly?

25        MS. RAMPTON:  Yes.

1          THE COURT:  All right.  I'm going to put this out

2    six weeks.  September 19th.

3          What day of the week is that?

4          THE CLERK:  Thursday.

5          THE COURT:  It is a Thursday.  You're to report no

6    later than 12:00 noon local time.  If it is a Phoenix,

7    Arizona facility, then you'll need to be there -- if I were

8    you, I would show up at 11:59, but I wouldn't be late.  It

9    could be in California.  I know there is a women's facility

10   in Dover, somewhere in California.

11          I had a female defendant from Hurricane several

12   years ago on a tax fraud case who didn't comply with the

13   order, so there is some history of the possibility of

14   noncompliance.  She eventually showed up, she just flaunted

15   my order initially.  You have got to do this or you're going

16   to just be facing additional time and additional problems.

17          I will let you self-surrender and that should give

18   you a better designation.  Because you don't have a violent

19   history, you may be in a camp or something that would be

20   more accommodating for your daughter and your son to have

21   access to you.

22          Good luck to you.

23          If there is nothing else, we'll be in recess.

24          (Recess)

25